Good afternoon. May it please the court. I am excited to be here to talk about this case. We are asking the court to reverse the summary judgment ruling on the economic loss rule because admiralty jurisdiction is not present. We are asking the court to hold that OXLA jurisdiction is the exclusive subject matter jurisdiction for the case. And thirdly we are asking the court to hold that OXLA choice of law rules require the application of Louisiana law because federal maritime law does not apply of its own force and because there is no other applicable and inconsistent law, federal law. The relevant and telling That chain failed and when the chain failed it allowed the collapse of a riser, a freestanding riser which was part of Petrobras' deep water oil and gas facility to develop minerals on the outer continental shelf. That failure resulted in hundreds of millions of dollars in damages and there is no dispute that the riser was permanently attached to the seabed and was part of an operation to develop minerals on the outer continental shelf. Now with those facts it's quite clear that OXLA jurisdiction is present because this is an OXLA situs. We've got a facility that has been permanently affixed to the seabed with the purpose of developing oil and gas and the activity out of which the loss arose was in fact the construction or putting into production of that facility. It's a very clear case for OXLA jurisdiction and it is just as clear that Admiralty doesn't apply because Wasn't that clear to you when you Briefed it? Went to the judge with the summary judgment motions and argued that and responded to it? Well, I'm not quite sure what Your Honor is referring to. Nobody said to the judge you've got to use OXLA and you've got to use Louisiana law. We were responding, I think what Your Honor is talking about is we were responding to a discreet motion for summary judgment on the economic loss rule. Excuse me, you cited the opinion I wrote in the BP case and I think that is out before you litigated this and you pled, your clients pled alternatively Admiralty or OXLA state law, correct? Correct. All right. But then when it comes time to brief it, you don't say Admiralty doesn't apply here because this is a matter of state law. That's correct. When it came time to brief it, we just argued about that there was Did you forget? Your Honor, we didn't forget, we took on the discreet issue that was raised at the time. You're saying you were only responding to the economic loss rule? Correct. Which was the basis for the motion for summary judgment? Correct. But look, we're talking about, I guess, the issue of waiver or the conduct of the lawyering that happened at the trial court level and there are two issues here, all right? The actions of counsel or parties to a case cannot waive or cannot give the court Admiralty jurisdiction if none existed. It doesn't matter what we did. There are plenty of cases saying this court can recognize Why wouldn't the appropriate disposition of this case be that the court did not have jurisdiction so we remanded for dismissal instead of its judgment? Set aside the judgment, vacate the judgment, remanded the district court to dismiss it because it had no subject matter jurisdiction. Well, because just as the court can recognize no Admiralty jurisdiction for the first time at this level, the court can also recognize for the first time at this level, for example, in the Laredo case as an example and Clyde as an example, that there is Oxford jurisdiction. Well, I mean, we can recognize that, but I mean, are we compelled to send it back to the district court for a redo? I'm saying that we would say the district court did not have jurisdiction over this under its Admiralty maritime jurisdiction. And consequently, it should the case should be dismissed. We vacate the judgment and remanded to a dismissal. Would that be I couldn't do that because you've already you played alternative. We have played Oxford. And the basis for the motion for summary judgment was was was a recovery. Economic loss recovery. Correct. Which would only apply maritime. Correct. You went farther than just responding to that dispositive motion because then you I assume the judge offered you the opportunity to try to replete around the economic loss rule with fraud. And you filed a new pleading that tried to do that. Did you not? Well, we were. Yes. The court suggested that fraud would be some way around it. We tried to do that. We also tried to amend our pleadings to say, listen, there is still this issue of Oxford. It's not before the court at this stage, but the magistrate has recommended to the judge. The magistrate has found that Oxford jurisdiction is present, that advocacy jurisdiction is not. But then compared the law of Louisiana to the federal maritime law, which doesn't apply and ruled that they're inconsistent. And now that's not here yet because the judge is sitting on it. But I think this court can clear that all up because we cannot. Basically, you've got the judge and the magistrate judge wound around the axle on issues that shouldn't even be litigated here. Well, I don't agree that these are issues that the issues need to be decided. Well, I understand that. But you were representing the plaintiffs. And if you had come into federal court, said it's Oxford jurisdiction, it's under 1332A2. And because it's a device permanently attached to the seabed, therefore, Louisiana law applies. Therefore, we have a negligence claim. That would have been real simple. It would have been real simple. All right. But, Your Honor, we're talking about a case in filing very early. We filed before the one-year prescriptive period under Louisiana law could have applied. And we're trying to develop. These things don't just happen offshore and then it becomes apparent to everybody what has happened. They're in a mile and a half of water. There is some discovery that is required in order to file things in good faith. And so sometimes counsel have to say, look, we're pleading this in the alternative, and we have to develop the case. That's a very good explanation, and I accept that. At what point, however, did you, did your clients realize that it was because of the, I mean, obviously you knew it was the defective weld, right? Yes. Because that's why you were filing suit. Correct. That was basically confessed early on by, or known early on by the parties. But it's not quite as simple when you're dealing with a facility that's a mile and a half below the ocean to just say here's what the evidence is and here's how this is going to go. And in one year, it does creep up on you pretty quickly. So we plead in the alternative. And then when the discrete motion on the economic loss rule is raised, we responded to that motion. Subsequently, we started to try to develop and get the court to recognize, listen, we have pled Oxlaw all along. And then Vic and I started making arguments about, well, you've waived it or it's no longer good cause to amend your pleadings. We're dealing, there are two jurisdictional issues here, right? There's Abiltee. We cannot confer Abiltee subject matter jurisdiction if it's not consistent. Did you bring that up to the district court? We have now. Or are you bringing it up to us for the first time? We brought it up to the district court, but it's to the magistrate and it's now sitting with the district court. I thought you had appealed. Beg your pardon? It was after you filed this appeal, though. You know, Your Honor, I'm not quite exactly certain of exactly the time. Or he could have corrected it and gone back. So I'm assuming it had to be after you filed this appeal because you were going through the motions. I don't understand why the magistrate judge didn't withhold ruling on the amended complaint pending appeal. I don't know. I don't know why they withheld the ruling. But the case law is voluminous that jurisdiction, subject matter jurisdiction exists or it doesn't. Nothing we do can make Abiltee jurisdiction jurisdiction. Let me ask you a question about that because I think that ultimately the waiver question is, at least in my mind, is the big question. I don't find your jurisdiction argument and the rest of your arguments very persuasive. But to the extent that you're arguing that the choice of law question is something that we just can't avoid, that you can't agree by contract that what the choice of law shall be in an Oxla alleged claim, and that therefore because you can't agree it, that you can't waive it. So the question before us, it seems to me at least on that issue, is can you waive it when you bring it up for the first time after you appeal? And in those cases in which this court has indicated that you can't agree to a choice of law situation, that you can't enforce that, any kind of an agreement. Were any of those cases where we announced that law cases in which that argument was brought for the first time on appeal? In other words, when we decided those cases, somebody is saying, hey, that agreement's not good. They're telling the district court, that agreement's not good. You can't do that. And so the district court has that issue before it. Or did we have cases where they negligently or tried to go on a different law, and for the first time on appeal, they said, well, it doesn't make any difference. They can't agree to it, and they can bring it up for the first time on appeal. Does any of them say that you can bring it up? Amclyde is that case, I think, Your Honor. And it's specific on point. Yes. If you look at Amclyde, and I was involved at the trial and appellate level in that case, and all of the lawyers in Amclyde, all the lawyers, thought that admiralty jurisdiction applied. And we tried the case. It was six weeks of trial. And that was after it's even been tried, not just on appeal. Right. We were wrong. We were wrong that admiralty jurisdiction applied in this court. Why would that be? Why are we wasting our time talking about jurisdiction and all that? Your Honor, I think the Amclyde case is directly on point here. There are two issues. There's federal jurisdiction, which exists under either admiralty or oxalate, either one, and then there's the question of which law applies. And you're here on the second question. And so on the second question of which law applies, it's quite clear if you look at the PLT engineering case, the argument was made that choice of law is not mandatory. It's only the jurisdiction that's mandatory. And that choice of law can be weighed. PLT engineering, considering that point, said it is beyond any doubt that oxalate is itself a congressionally mandated choice of law provision. It said beyond any doubt. So I guess Judge Pulitz didn't write it. He would have said beyond capital. But it was a congressionally mandated choice of law provision that the substantive law of the adjacent state apply. And in the Amclyde case, the same thing was said. It is a choice of law provision that is mandated by Congress. So we're dealing with we can't confer our admiralty jurisdiction by any action. We can't waive or agree. If you can't agree to get out of, you can't agree to choose to be opt out of a congressionally mandated choice of law system that has been imposed on all activity on the Outer Continental Shelf. Thank you. And what I would like for you to do is just take about one minute and sum up exactly, one, two, three, four, what your position is. Yes, Your Honor. There are three points. First, we think that the summary judgment ruling on economic loss has to be vacated because there's no admiralty jurisdiction in the case. If there's no admiralty jurisdiction, you don't apply the economic loss rule. Secondly, the court should rule that OXLA provides the exclusive subject matter jurisdiction in this case. These facts don't support admiralty jurisdiction. They do support OXLA jurisdiction. Third, when you look at the OXLA choice of law provisions, Louisiana law has to apply. It's the law of the adjacent state. There is no federal maritime law does not apply of its own force. There's no admiralty jurisdiction. There's no federal maritime law. And there's no other federal law that is applicable and inconsistent with Louisiana law on the point. So the result has to be on a jurisdictional and mandatory choice of law provision mandated by Congress that we go back to deal with this under OXLA and Louisiana state law. And implicit in that, of course, is that there's no procedural bar that precludes your raising a jurisdictional issue like this after having been waived at the trial court level. Yes, Your Honor, and there are lots of cases where jurisdictional issues are raised, and then I just cited the Amcly case, you know, rightly or wrongly. Well, if the parties can't get together and agree, what sense does it make that somebody can't do it in adverse? If you can't do it on purpose, you can't do it by action. Well, if it's that easy to get out of a congressional mandate, then Congress can't do what they want to do without Congress. Okay, well, thank you very much. I think we have your position in hand. Mr. McDermott, we'll hear from you. Let me ask. I assume you're here because the insurance doesn't fully cover your loss. Yes, we still have standing. Petrobras has standing because all of its damages are uninsured. Who's, what's, all of you, what? Petrobras, the damages that it is seeking are not insured by the underwriters. Well, who do the underwriters insure? They insure Petrobras, but they're paid under the policy. But I'm saying it's underinsured. Correct. Okay. Yeah, exactly right. Okay. And I'm here in the alternative because Petrobras supports the underwriters' views on jurisdiction. If there is no maritime jurisdiction, then the district court's judgment has to be reversed on that basis. But why we are here is if maritime jurisdiction were to be applied, you say it doesn't, but were it to be applied, then the judgment would still have to be reversed because the economic loss rule should not apply in this case to bar the tort claims. Why? Because it doesn't apply given the facts of this case. It doesn't apply in particular given the nature of the EPCI contract, the contract between Petrobras on the one hand and TECME, the non-party, on the other hand. The EPCI contract to be construed in red in the light of another contract, the purchase order for the defective tether chain between Visine as the seller and TECME as the buyer. If you read those two contracts together, we say, as the court must, then the product was not this immense riser system, one and a half miles going from the seabed to the FPSO vessel one and a half miles above on the surface. The product is the defective chain. This case, as the district judge ruled, is far, far, far afield from East River which begat this entire economic loss doctrine. If you look at the EPCI contract here, the contractor, TECME, is not even a manufacturer. It outsourced the manufacturing of each element of the riser system. And there weren't many elements to the system to begin with. The district court lists the ten elements. What is TECME? You say TECME produces no product? No single product is what you're saying, am I right? No, TECME is… It's like a builder. It's like a general contractor. That's right. It goes and it outsources from third parties all the elements. And then it puts the parts together. Exactly right. And that's what it did here. We have a system that goes from seabed to the surface. Whether you have ten elements, as the district judge found, whether you have 21 elements, which is what the evidence shows, it's just one product after another linked together in sequence successively to come up with what at the end of the day is a system, the freestanding hybrid riser system, a system comprised of products. Which product is relevant here? That product is a tether chain. Well, how's that any different from a ship? Say you've got a ship that's still under warranty by the shipyard and something on the propeller goes bust and damages, you know, the ship. It gets damaged. I don't see the difference. Well, that's basically the ship code case, Your Honor. I mean, East River dealt with the turbine parts harming the turbine. Ship code dealt with the elements of the steering gear. Why is this case different? Avondale was the manufacturer in ship code. Technique is not a manufacturer here. A shipbuilding contract is not analogous to the type of EPCI contract that we have in this case. It's particularly not analogous to the EPCI contract, which, as we say, is just assembling component parts produced by a dozen or so different manufacturers. It's not analogous. That's when you look at the subcontract, the purchase order between Technique and Visine, because there you see exactly what you would expect to see in a product manufacturer's contract with a user, the product manufacturer Visine. Thank you very much. Thank you. Yes, indeed. Mr. Baker, we'll hear from you. Thank you, Your Honor. There's a lot that could be said in this case, but let me see if I can go to exactly what I think is pretty clearly on the Court's mind. And that is the real question in front of you is whether choice of law can be waived. That's what's bothering the Court, and we think it's absolutely clear that it can. What's your best case for that? The best case, Your Honor, is the fact that constitutional rights can be waived. Think about it just for just a second. Waiver is what makes our system of justice work. A litigant is in— Excuse me, sir, but we have the BP case, which I wrote. We have the Laredo offshore. We have at least one other, all of which say you can't waive OXLA because it's statutory, and that's because the Supreme Court said it's a statutory cause of action. The difference, I think, Your Honor, is the fact that OXLA subject matter jurisdiction is here. We've never contested that. The issue on choice of law, however, was never presented to the district court as a result of the deliberate decision of the appellants that are here before you. And it can be waived, we believe, by the deliberate refusal to raise the point because think of the issues that are waivable. Sovereign immunity is waivable. Constitutional due process. But what do you do with specific language from our court that says even when it's raised on the first time on appeal and even after a trial has been conducted that, you know, you go back to square one, that it wasn't waived? Well, with greatest respect, the Amclyde case was presented to the judge. The judge did make a ruling. The ruling—that's not what happened here. That's not at all what happened here. Well, they did at least plead in the alternative. And they assert that they were responding to your dispositive motion. Well, the key point on that is they did plead it, and that's why I'm saying it can be waived, Your Honor, when it was pled because litigants are masters of their own case. They have the right to decide what claims to bring, what claims to drop. It happens all the time, every day. And, in fact, if it were otherwise, then this court would be imposing a rule that the district court would have an obligation to ask every single party any time there was a case what other matters are not presented in this motion that we would— One thing that can't be waived. I'm sorry? One thing that can't be waived is jurisdiction of the court. Subject matter jurisdiction. That's correct. And that is what—so we accept the first premise of your argument, and that is that choice of law can be waived, and you waive it. And the effect of waiving is to waive jurisdiction. Doesn't that complicate the simple argument that you're trying to make? No, Your Honor, because every court where there is OXLA subject matter jurisdiction—and we think there's admiralty jurisdiction as well—but every court is confronted with a choice of law issue, if you will, if OXLA is applicable for subject matter. And those, of course, include— But it seems to me that you're arguing broad general principles here as to why choice of law is waivable. And I'm just saying that—and then you get down to the specifics of this case, and you lose the—or you modify the broad general principles down to a specific case of OXLA. Well, the specific— That is—and that makes it non-waivable because— With all due respect, Your Honor, I'll disagree, and I'll tell you why. Because in OXLA, one of the applicable laws is maritime law. Maritime law, this Court has said repeatedly, can apply to an oxlocytis. Maritime law can apply to its own force— Your argument assumes that maritime law is applicable here and that this case can be decided on maritime law, irrespective of connection and location. Connection and location are clearly met. They told the court it was maritime torts. We agreed. They told the court it was maritime— I understand that. —so that they could avoid the arbitration provision that is connect—that was in the purchase order that they also told the court that they were disclaiming and running away from. But we're beyond that now. I understand, which gets us to why maritime law is applicable. The district court was entitled to rely on the fact that maritime law was applicable because they did not affirmatively come forward— So they have stipulated—you say they have stipulated connection and location. Is that what you're saying? In their own pleadings, they said, Your Honor, it was on a navigable waterway, which is clearly the Gulf of Mexico, and the location test was—I mean, the connection test was clearly met because they described this as being an FPSO system whose key virtue is the fact that it's a ship-based system. But if you can stipulate that, you're saying you can stipulate jurisdiction, which you clearly cannot. No, you can stipulate the applicable law under OXLA subject— to the contrary. Now, as Judge Benavides pithily put it, if you can't do it purposely, how can you do it by accident? Because they stipulated and pled both— They pled both, and there are cases, as we all know, where that's a real close question. I have doubts whether it's a close question. I have grave doubts that it's a close question here. But what—I mean, PLT doesn't state the law of the Fifth Circuit? The language is clearly the language, Your Honor. There's no doubt about that. But I must say to you, I really believe we're in a situation where, if you look at this situation, their argument swallows everything. They would say that every case where OXLA-CITUS is found, where it was a fixed platform, which is the consistent rule that runs through this circuit's jurisprudence, excludes admiralty law. Pleading OXLA jurisdiction is not the same thing as pleading Louisiana torts. It's not the same thing as remaining silent. They pled all sorts of neglig—they pled all sorts of torts, did they not? They pled maritime torts. There's no doubt in—well, torts are torts. Negligence, gross negligence, you know, that sort of jurisdiction in specific. Yes, they characterized all of those, Your Honor, as maritime torts. That's their words. Well, nevertheless, I mean, 1332A2 applies to the civil and criminal law of each adjacent state applies to fixed structures erected on the outer continental shelf. Correct. Fixed structures erected. This is a floating structure. It's only—it's about as fixed as it can be, and it is not a vessel. With the greatest respect, Your Honor, I think if you'll allow me, what you have is on the seabed, which is a mile and a half below— I looked at the charts. I know exactly what it looks like. If you want me to regurgitate what it looks like, I'll tell you. But I do not understand. Why don't you move on to explain how it could possibly be admiralty law, if that's your position? Admiralty law was pled. The court decided the case. Well, yes, but your argument is that it is admiralty law, and therefore the economic loss doctrine applies, right? That's correct. Why is it covered under admiralty? Because it involves the use of vessels on a navigable waterway in connection with a traditional maritime activity. And what is your best case for saying that this FHSR, which to my knowledge I think is a pretty unique device in terms of our Oaks jurisdiction cases, has a sufficient connection to the traditional scope of admiralty law? To my knowledge, this circuit has never decided a case with these facts and circumstances, which is what I was trying to say about the difference. If you looked at it just briefly, you would say that, okay, seabed floor installation, oxla, vessels floating, shuttle tankers traditionally moving oil to shore rather than pipelines, traditional maritime activity. The court has never made a distinction on which applies under those circumstances. And I'm saying that maritime law applies of its own force because the two-pronged test is met because of location and the connection to traditional maritime activity. That's my principle point. What about their argument that it is not on navigable waters but 600 feet below navigable waters? Well, their own pleadings, Your Honor, characterize this multi-story buoy as having floated 36 miles across the Gulf of Mexico, therefore affecting maritime commerce. That's about as close to the navigable waterways as you can get. But, I mean, the accident that we're talking about and the tort that we're talking about actually occurred 600 feet below, and it would seem to be completely divorced from the fact that it may have traveled waters to get there. On a buoy, Your Honor, which is clearly a maritime application, you don't use buoys on land. Buoys are the creature of the sea. That's what— I mean, I don't know. I'm asking you. They make the argument that you have to strictly construe on navigable waters. And if it's below navigable waters, then it is not met the location test. This court has never said that, Your Honor. Well, doesn't it make sense? No, Your Honor, because the question under the test is the ability to affect maritime commerce. Well, where has the Supreme Court said that the—I mean, every time the Supreme Court has had these cases, and I could certainly be corrected, but it had to do with different kinds of vessels, and how much motive power did the vessels have. And to me, this is a fixed structure on the outer continental shelf because the whole purpose of that buoy was to suspend the riser more or less in place. Well, the riser is connected to vessels. It's more like a—of course, but it's more like a pylon. The purpose of the buoy is to suspend it in place to allow the oil to flow upwards, and therefore it's sort of like a pylon. A pylon is a fixed structure. The beauty of this is that the buoy can move up and down. That's its touted benefit as part of the FPSO system while the vessels sail away. But the key is what—and the Supreme Court in their cases looked to what was the principal object of the activities. And here it's the shuttling of oil through vessels to shore. That's where the oil goes. That's the object of the exercise. That's what makes the whole thing work. And a buoy is what makes that process possible. Again, a maritime application. All right. Your motion, please. Thank you, Your Honor. The principal point, I think, is the one that was raised in questions to the appellants earlier on, and that is why is this case here? We would say that they have waived all of their positions. They've waived their Rule 16 good cause argument. They abandoned it between the magistrate and the district court. They did not preserve it. It's not here. Same thing with respect to the way in which they waived their choice of law argument. It's not here. This should be a per curiam decision dismissing the appeal. All right. Well, why don't you move along to the economic loss rule? The economic loss rule, I believe, is clearly applicable. Your colloquy with counsel about SHPCO is exactly on point as it is with the helicopterist case. The fact that a manufacturer or an assembler, none of that has mattered. What has always mattered to this circuit was the legal test that is conducted on what was the object of the contract, what was being purchased that could be addressed through the contractual warranty system. Here, there is no doubt from their own pleadings as well as the contract that the district court got it right. The object of the contract was the purchase of the FSHR system. That's what was purchased by Petrobras from Technique. Is it your argument that that whole, I'm sorry, I'm pushing you back again, that whole underground system, which probably spans a mile or more, right, is all controlled by admiralty jurisdiction? That's correct. Size has never been an issue in any of the jurisprudence, Your Honor. Well, this would be going a great deal farther, I think. As this court has recognized, every product is composed of multiple smaller products and assembled. That's why it's always been a legal test, not a factual test, not an expert test in this circuit about what was the object of the contract because it deals with whether or not warranties could deal with the allocation of risk of loss. That's the whole point behind the economic loss doctrine. And here, they bargained for and were able to receive contractual warranties. As this court and others have made very clear, that's where this belongs, not in the tort system. This is a clear application of the East River line of cases. Nobody's depriving them of the remedy. They just— They chose to not exercise those remedies themselves. It's all part of the deliberate decisions that were made that put this case in its current posture in front of this court. Well, you've got to admit that you don't come in here with a full deck yourself. I mean, just in terms of sort of bad fact. There is no doubt, Your Honor, that that is true. But we think we've played the hand as well as we could play the hand. Well, let me ask you to finish your argument here. I'd rather answer your question, Your Honor. Well, I just wanted you to answer or to reply to the same proposition that I put to the other side, and that is to sum up in about one minute what you would try to—the points 1, 2, 3, 4 of how you would leave us to decide the case in your favor. Subject matter jurisdiction exists under admiralty and oxla. Choice of law can be waived. The jurisprudence of this court in Amclyde and Laredo offshore do not stand for the proposition that you can revive dismissed claims based on choice of law issues that were never first presented to the district court. The economic loss rule was properly applied because the court got it right. The FSHR system was the product, the object of the exercise, and that was what was purchased. The district court did what it was entitled to do, which is rely on a litigant's ability to decide as the master of its case what to bring up and what not to bring up. I wish you . . . you know, you're making such a grand argument, and I do not understand why you keep fixating on that no waiver point in light of our authorities. You just haven't persuaded me a bit about that. You've got three minutes to try to persuade him. Well, I just know. I mean, it's . . . Unfortunately, I've said what I . . . I mean, your alternative argument is obvious that even under 1332A2 or 1331A2, whichever, that admiralty law applies here rather than Louisiana law, right? Yes, I thought we'd already covered that, Your Honor. I thought we were covering that, and that makes your waiver argument totally irrelevant. I would agree with that, and so that was my point, is that the admiralty jurisdiction clearly exists. Both parties briefed this to the district judge under admiralty law. No one said anything differently about it. Let me ask you one other . . . we've got another appeal up here, as I understand it. Is that right? No, this court has already dealt with that and dismissed it. Oh, okay. Okay, Mr. Becker, does that conclude . . . That concludes, Your Honor. Thank you very much. Yes, sir. Thank you. Mr. Hall, you have three minutes for rebuttal. Thank you, Your Honor. I'd like to just address the point Judge Jones just raised. We had to file an appeal within a certain time period, and then we had to deal . . . in order to lodge the appeal effectively, and then we had to deal with some other issues in the trial court. We then tried to raise some other issues. It came up . . . another appeal came up. A different panel dismissed it without . . . I'm not sure how or why that happened. Were we notified about that? Or is this panel? This panel. I don't know. All right. I don't know how . . . We can look it up on the docket. Okay. I just had some . . . there was something in the briefs about another appeal becoming moot depending on how this one came out, and that's why I wanted to resolve it. Was there a request to dismiss by opposing counsel in that case? In other words, is there any indication of anything that would lead us to know other than asking the panel why it dismissed it? There might have been. Yeah, there was a . . . They were consolidated in the screening panel and dismissed it? Oh, okay. All right. Thank you. I just want to make one point about waiver. Mr. Baker talked about you can waive a constitutional right. That's not what we're talking about here. We're not talking about the waiver of a right. We're talking about the parties having an effect on the existence of subject matter jurisdiction in the case of Abbington. You can't make it exist if it doesn't. And then their actions of the party being able to basically eviscerate congressional intent to enforce a regulation on the development of minerals on the Outer Continental Shelf. Well, do you want to make a brief argument about why, even if this is under Oakes law, Admiralty law would not exist? He contends that this is a structure that falls within the scope of Admiralty jurisdiction notwithstanding. Sure. Mr. Baker talks about vessels shuttling off oil off of the FPSO. There is a vessel in the neighborhood in everything that's offshore. Yeah, and whenever you have a fixed production platform, there are vessels. There are vessels around. And the presence of a vessel in the neighborhood is not in this jurisdiction and never has been enough to confer Admiralty jurisdiction. It wasn't enough in Amclon. You had a vessel picking up cargo off of another vessel and it dropped it. And the court said, but look, this is a construction activity on the Outer Continental Shelf to build and erect a compliant tower that's attached to the bed in the Gulf of Mexico. We have the same thing here. We have even less attachment. We've got a subsea development. That riser, as Judge Jolly noted, stops at 650 feet, more than that, below the navigable waters. There's a reason for that because they don't want to even have a potential to be a hazard to navigation. That's why it's down that low. And so the notion that the failure of a bunch of pipes, risers, a riser in this case, the failure of a pipe that's there to transport oil is somehow Admiralty when it all happens well below any navigable waters. Technically what failed was the chain that connected that buoy to the riser. It's not a buoy. It's a buoyancy cam. A buoyancy cam. It's what it's called if you look at the diagrams. A buoy is a navigational aid. A buoyancy cam is something that's part of a construction project and it does hold the riser up. The riser fell. The riser has, there's nothing salty about the riser. The riser is oily. It's a creature of the oil field. It's got nothing to do with maritime activity. And that's the only thing that failed here. Thank you. Yes, thank you, Mr. Hall. Mr. McDermott, you have a couple minutes for rebuttal. Just one point, Your Honor. Mr. Baker said the object of the contract, the EPCI contract, was a FSHR system. It was actually all five systems. That was what Etrobras was buying. That is what Techneap is providing. Those five riser systems do not constitute a single product for East River purposes. You have to look at the elements of each of the systems. You have to look at those elements within the confines of the nature of the EPCI contract, viewed in the context of the purchase order. And if you do that, we suggest the Court cannot conclude that all five riser systems comprise a single product. Thank you. Thank you, Mr. McDermott. That completes the argument, I believe, and we'll call the next case of the day.